**FILED**
7-21-2011
JUL 2 1 2011 NF

AO 91 (REV.5/85) Criminal Complaint

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AUSAs Brandon D. Fox (312) 353-5277 and Margaret J. Schneider (312) 353-1875

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ELIZABETH PERINO

**MAGISTRATE JUDGE COLE**

**CRIMINAL COMPLAINT**

CASE NUMBER: **11CR        492**

**UNDER SEAL**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about July 6, 2011, at Lockport, in the Northern District of Illinois, Eastern Division, and elsewhere, ELIZABETH PERINO defendant herein:

> having devised and intending to devise a scheme to defraud, and to obtain money and property from by means of false and fraudulent pretenses, representations, and promises, deposited and caused to be deposited fraudulent documents, including a backdated estimate, a backdated letter of intent, a false bill, and a false certification of work, to be sent and delivered by FedEx, a commercial interstate carrier, to the owner of Prime Contractor B so that Prime Contractor B could use the invoices and other documents to falsely state to the City of Chicago that Perdel Contracting Corporation, a Women's Business Enterprise, had provided $95,648 in equipment rentals to Prime Contractor B as of June 30, 2011, when, in fact, Perdel Contract Corporation had not provided any such equipment to Prime Contractor B,

in violation of Title 18, United States Code, Section 1341. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
STEPHEN J. O'REILLY
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 21, 2011
Date

at

Chicago, Illinois
City and State

JEFFREY COLE, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT )
             )  ss
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, STEPHEN J. O'REILLY, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation, and have been so employed for 15 years.  My current responsibilities include the investigation of white collar crime, including mail fraud, wire fraud, and public corruption offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that ELIZABETH PERINO has violated Title 18, United States Code, Section 1341.  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PERINO with interstate carrier fraud, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, my review of recorded conversations, my review of documents, and my discussions with Cooperating Witness 1 ("CW1").

4. During times material to the complaint, the City of Chicago, State of Illinois, federal government, and their various agencies had laws and rules establishing programs designed to increase the utilization of categories of businesses known as minority business

business enterprises ("DBEs"). Bidders hoping to do business with these governments had to comply with the laws and rules applicable to the MBE, WBE, and DBE programs in order to receive the contracts they sought. Government entities often conducted audits to determine whether companies were complying with the applicable law and rules, including that the MBEs, WBEs, and DBEs were performing commercially useful functions, rather than acting as sham or pass-through companies.

5.     As shown below, there is probable cause to believe that ELIZABETH PERINO has engaged in WBE and DBE fraud by falsely representing to government entities that her companies, Perdel Contracting Company ("Perdel Contracting") and Accurate Steel Installers, Inc. ("ASI"), were performing WBE and DBE eligible services when, in fact, Perdel Contracting and ASI often acted as pass-through organizations utilized by prime contractors to circumvent the regulations and the law and to obtain and keep city, state and federal contracts that require WBE and/or DBE participation.

**Relevant Individuals and Entities**

6.     According to its website, Perdel Contracting specializes in concrete and carpentry and has been certified as a WBE and DBE by several government entities, including the City of Chicago (the "City") and the Illinois Department of Transportation ("IDOT"). The company's website states that ELIZABETH PERINO is the president, secretary, treasurer, and chief executive officer of Perdel Contracting. The website also states that PERINO serves on the IDOT "Taskforce for DBE Regulations."

7.    According to the Illinois Secretary of State's Office's website, PERINO is the president and secretary of ASI.  According to IDOT records, ASI was certified as a DBE specializing in steel installation and reinforcing.

8.    According to its website, Prime Contractor A is a construction and infrastructure firm that has contracted to work on billions of dollars worth of government and private construction projects.

### *Pertinent DBE Regulations*

9.    According to federal regulations, which were incorporated into the contracts that PERINO entered into with Prime Contractor A, the amount of a DBE's participation in a contract is only to be measured by "the value of the work actually performed by the DBE toward DBE goals." 49 C.F.R. § 26.55(a).  A prime contractor's payments to a DBE count toward the DBE goals "only if the DBE is performing a commercially useful function on that contract."  49 C.F.R. § 26.55(c).  The regulations state that a DBE is performing a "commercially useful function" when it "actually perform[s], manag[es], and supervis[es] the work involved." 49 C.F.R. § 26.55(c)(1).  The DBE must "be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material, and installing (where applicable) and paying for the material itself." *Id.*

10.    According to an employee of the City's Office of Procurement, which contracted with Prime Contractor A on the North Avenue bridge project described below,

3

during a project, the prime contractor was required to submit DBE utilization reports on a quarterly or annual basis. During compliance audits, the City asked for participation affidavits from the DBE participants.

11.    As shown below, PERINO acted as a pass-through on contracts with Prime Contractor A by billing for work that her companies did not perform, manage, or supervise. Indeed, Prime Contractor A negotiated prices with ASI and Perdel Contracting subcontractors, determined quantity and quality of material, ordered the material, and installed the material. PERINO and Prime Contractor A certified to the various government entities that PERINO had performed work and Prime Contractor A took credit for pass-through payments made to PERINO so that Prime Contractor A could meet its DBE goals.

### *Perino's WBE Fraud with Prime Contractor A as Prime*

12.    According to documents I have reviewed, on approximately May 1, 2006, the City of Chicago held a preconstruction meeting regarding its award of the reconstruction of the North Avenue bridge to Prime Contractor A. The same day, the City provided Prime Contractor A with written instructions regarding compliance with the DBE conditions of the contract. The instructions stated that Prime Contractor A should enter into a formal subcontract or purchase order with its DBEs that were proposed in accordance with the terms of Prime Contractor A's bid. The instructions further stated that Prime Contractor A was to incorporate all federal and state mandated subcontract provisions as required by the specification for the project. The instructions also directed Prime Contractor A to file regular

4

DBE utilization reports that provided a status of payments to the DBE at the time that Prime Contractor A submitted each monthly voucher seeking payment. According to the instructions, the City of Chicago would not process the voucher until the utilization report had been presented. The federal terms and conditions specifically mandated that Prime Contractor A carry out the requirements of 49 CFR Part 26.

13. A form called a "Schedule C" is used by DBE subcontractors as a letter of intent to perform work as a DBE subcontractor for a prime contractor. On January 31, 2006, PERINO signed two Schedule C letters of intent to perform work as a DBE subcontractor for Prime Contractor A on the North Avenue bridge reconstruction project. The first Schedule C indicated that ASI would perform $5.1 million in subcontracting work. The second Schedule C stated that Perdel Contracting would perform $1.6 million in subcontracting work. Both letters of intent stated ASI and Perdel Contracting would not be subcontracting any of the work. As shown below, ASI and Perdel Contracting subcontracted a substantial amount of work to several companies, as directed by Prime Contractor A.

*Perino and Prime Contractor A Pass Subcontracts that Prime Contractor A Negotiated and Supervised through Perino's Companies*

14. According to Project Manager A, a former ASI project manager, ASI issued purchase orders to subcontractors based on information provided by Prime Contractor A to ASI. Project Manager A stated that he would have to send any changes from subcontractors to Prime Contractor A because Project Manager A did not have the authority to make the changes. Project Manager A said that Prime Contractor A would mark up these purchase

5

orders and send them back to Project Manager A, who would then forward the revisions to the subcontractor.

15.     Similarly, Project Manager B, who was a project manager working for Prime Contractor A on the North Avenue bridge project, stated that Project Manager B and other Prime Contractor A employees negotiated with subcontractors over the sale of steel and provided the information to ASI so that ASI could prepare a purchase order.  Project Manager B stated that Prime Contractor A decided to have all the steel paid for by ASI so that Prime Contractor A could satisfy its DBE goal.  Project Manager B stated that ASI lacked the necessary experience to manage all aspects of the North Avenue bridge project. Project Manager B related that she and another Prime Contractor A employee acted as the consistent project managers and that the subcontractors and suppliers to ASI went directly to Prime Contractor A with technical questions because ASI's project managers did not have the ability to answer the questions.

16.     In or about July 2006, PERINO entered into subcontracts with Prime Contractor A on behalf of ASI and Perdel Contracting on the North Avenue bridge contract. After they entered into these subcontracts, PERINO entered into "second tier" subcontracts (i.e., subcontractors' subcontracts) with companies on the North Avenue bridge reconstruction project based on terms that Prime Contractor A had negotiated with those companies. For example:

6

a.      On or about May 24, 2006, PERINO sent an email to Prime Contractor A stating, "Please do not forget to get me all the PO's [purchase orders] for North Avenue Bridge so we can get them ready in our system. HOWEVER, WE WILL NOT SEND THEM OUT UNTIL YOU SAY IT IS OK!!!." (Capitals in original). On or about July 7, 2006, Subcontractor A submitted a quote to Prime Contractor A for ready mixed concrete to be used on the North Avenue bridge contract. On or about May 8, 2007, Prime Contractor A submitted a purchase order to Subcontractor A for ready mixed concrete on the North Avenue bridge project. On or about May 21, 2007, a Perdel Contracting employee sent a facsimile to Subcontractor A stating, "I am faxing this purchase order to [Subcontractor A], since Perdel is the sub that [Prime Contractor A] is going through to order concrete for the North Avenue Bridge project. I understand that [Prime Contractor A] ordered concrete last week through their account . . . all this ordering of concrete must be run through Perdel for tracking purposes for the entire NAB [North Avenue bridge] job/project. I am sending this P.O. to get process started, Per [Prime Contractor A], and then I can track and bill accordingly."   On or about June 6, 2007, the same Perdel Contracting employee sent Subcontractor A a facsimile with a cover page stating that Prime Contractor A had provided a "letter of guarantee . . . in order to switch the [Prime Contractor A] concrete orders over to Perdel . . . we aren't going to worry about the name change [from Prime Contractor A to Perdel Contracting] on the delivery tickets. As long as the billing gets billed through Perdel."

7

b.      According to an employee of Subcontractor B, Prime Contractor A contacted Subcontractor B about the North Avenue bridge contract in December 2005. This employee stated that Subcontractor B sent proposals to sell transverse beams and tube struts to Prime Contractor A on the North Avenue bridge contract on or about January 27, 2006, February 10, 2006, and July 19, 2006. The same employee stated that Prime Contractor A handled the bidding and negotiations, and provided design specifications. Further, he said ASI did not enter the picture until Prime Contractor A and Subcontractor B were finalizing the purchase order. On July 31, 2006, an employee of Subcontractor B wrote an email stating "We are going to be awarded a contract for [Prime Contractor A]; however, they needed to have a portion of the overall contract go through a minority contractor. Therefore, they are going to award the contract to Accurate Steel Erectors (sic) and the Accurate Steel Erectors (sic) will award the steel to [Subcontractor B]."

c.      A February 12, 2007 email from Prime Contractor A to PERINO directs PERINO to "See attached the quote from [Subcontractor C] regarding rebar for North Avenue bridge. He is honoring the same price as a year ago. I need the agreement between Perdel and [Subcontractor C] and I need to know the unit price from Accurate steel [sic] to [Prime Contractor A]." The attachment was a February 1, 2007 quote from Subcontractor C to Prime Contractor A for material to be used for the North Avenue bridge reconstruction project. According to a Subcontractor C manager, his company bid furnishing steel rebar to Prime Contractor A on this project. This manager stated that after Prime Contractor A

8

informed Subcontractor C that it had won the bid, Prime Contractor A stated that it needed to submit a quote to ASI and that the business would go through ASI. According to Subcontractor C's manager, however, ASI did not solicit a bid from the company and issued a purchase order that was substantially the same as Subcontractor C's original bid to Prime Contractor A. According to documents later submitted by Prime Contractor A, ASI, and PERINO to the City, Prime Contractor A took DBE credit for the amount it paid to PERINO's companies for the material Subcontractor C provided for this project. Therefore, it is my understanding that: (a) Prime Contractor A and Subcontractor C negotiated a price for the material Subcontractor C was to provide on North Avenue bridge; (b) Prime Contractor A directed PERINO to contract with Subcontractor C, who would supply material to ASI; (c) PERINO added a profit into Subcontractor C's quote; (d) PERINO billed Prime Contractor A for Subcontractor C's work plus a profit margin; and (e) Prime Contractor A took DBE credit for the amount it paid to ASI for Subcontractor C's work, plus the profit margin.[1]

17.    PERINO's use of subcontractors selected by Prime Contractor A with terms negotiated by Prime Contractor A extended to other projects. For example:

---

[1] One manager for Subcontractor C stated that he did not believe that ASI was a pass-through because ASI conducted all the logistics regarding the shipping of materials. Another manager with Subcontractor C, however, stated that Prime Contractor A was managing the job, and that PERINO even instructed this manager to contact an employee of Prime Contractor A when Subcontractor C had questions.

9

a.    An employee of Subcontractor E stated that he was contacted by Prime Contractor A in mid-2006 about supplying a quote for concrete vaults for Prime Contractor A's Chicago Transit Authority ("CTA") Red Line project. The employee stated that he had worked extensively with Prime Contractor A in the past. According to the employee, Prime Contractor A asked him if Subcontractor E would mind being paid through a DBE company, Perdel Contracting, to help Prime Contractor A reach its project goal. The employee stated that he worked out the details of the contract with Prime Contractor A and Perdel Contracting later drafted the purchase order and paid Subcontractor E for the concrete vaults.

b.    On or about December 22, 2006, a Prime Contractor A employee forwarded PERINO, via facsimile, a letter of intent from Subcontractor F to furnish $470,000 in structural steel for Prime Contractor A's CTA Brown Line project. The letter of intent listed the scope of work that Subcontractor F would perform. The cover page on the facsimile from Prime Contractor A to PERINO stated, "Reference the following pages representing the signed schedule "C" for [Subcontractor F]. Please issue a letter of intent, so they can start the shop drawing process. Fax to [Prime Contractor A] for approval of letter before sending."

c.    According to a representative of Subcontractor G, which performed work on Prime Contractor A's CTA Brown Line project, he worked out the specifics of the purchase order with a Prime Contractor A employee. The representative stated that after they

worked out these details, he was told that Subcontractor G would be working through ASI because of the DBE requirement on the project.

18.     On or about July 8, 2008, Project Manager A, at the USDOT-OIG's direction, placed a recorded telephone call to PERINO.  On the call, Project Manager A informed PERINO that he had been interviewed by federal agents and had informed agents that he took the information that Prime Contractor A gave him and put it all in a purchase order. PERINO acknowledge that this occurred, stating, "Well yeah . . . when they [Prime Contractor A] negotiated contracts, those were terms and conditions for the contracts they negotiated."

### Perino Refuses to Incur Expenses without Prime Contractor A's Approval

19.     Emails show that PERINO would not incur expenses from subcontractors without Prime Contractor A's approval.  For example:

        a.     On or about November 20, 2006, an employee of Prime Contractor A sent an email to PERINO stating:

Elizabeth:

As we discussed, consider yourselves off the hook this time and we will pay accordingly . . . .

As we agreed, in the future, no Change Orders shall be sent to any vendors [subcontractors of ASI/Perdel Contracting] without my personal signature on an "Approval Cover Sheet" . . . .

I can't sign on any official documents, such as your P.O. Without said authorization sheet, Perdel and ASI are not to initiate the process of issuing  C.O. – just like the purchase orders.

11

b.    PERINO's email account forwarded the November 20, 2006 email to employees of ASI and Perdel Contracting with the message "FYI Read below and follow. TX [thanks] EP [ELIZABETH PERINO]."

c.    On or about June 27, 2007, a Perdel Contracting employee sent PERINO an email asking PERINO about a bill for $19,248 from Subcontractor D. Specifically, the email asked whether that "figure is okay [to pay]." PERINO responded that "This is fine with me, [Prime Contractor A] has to approve or my OK means nothing. LMK [Let me know]."

### *Perino Places Prime Contractor A Workers on her Companies' Payrolls*

20.    Documents show that Prime Contractor A provided PERINO with employees to put on ASI and Perdel Contracting payroll. For example:

a.    On or about June 1, 2007, an ASI employee sent PERINO an email stating,

Elizabeth –

just found our [out] some interesting info., none that I was aware of until today . . . [Worker 1] turned in timesheet, and he had 8 hours for Monday 5/28 (Memorial Day) recorded . . .

I asked him with a smile, if he was kidding me, and he said "really, I was guaranteed 40 hours, same as the deal at [Prime Contractor A]", "or else, why would I come here for less money. . ."

He states he gets the same pay scale he had at [Prime Contractor A], 40 hours a week, and he makes over the general foreman's pay rate. . .

12

I told [Worker 1] that I would let you know, and if need be, clarify with [Prime Contractor A official]

b.      On or about July 26, 2007, a Perdel Contracting employee sent an email to other Perdel Contracting employees stating that:

[Superintendent 1], the superintendent out here at North Ave. just called me and wants Perdel payroll to get a hold of [Prime Contractor A] payroll, and set up a workers child support taken out of his Perdel check, like he had it set up with [Prime Contractor A], before they made him go through Perdel for this job . . . .

His name: [Worker 2]
he works for [Prime Contractor A], but on this job, he has to be paid be (sic) Perdel, and it has messed up his child support . . . [Prime Contractor A] wants us to fix this for him. . .

c.      On or about August 14, 2007, a Perdel Contracting employee wrote in a business record that "as of next week, all of the carpenters, laborers, operator & oiler will be back on Prime Contractor A's payroll. Perdel will only carry and pay the finishers on the concrete pour days . . . . [a Prime Contractor A employee] wanted the carpenters taken off last week. He wants to show different percentages to city, and ours was way too high." I understand this statement to mean that the referenced workers had previously moved from Prime Contractor A's payroll to Perdel Contracting's payroll, and were now being moved back to Prime Contractor A's payroll. I further understand that this was occurring because Prime Contractor A was exceeding its DBE goals with Perdel Contracting and wanted to avoid the costs of the pass-through while in excess of its DBE goals (as stated below, ASI billed Prime Contractor A for its full labor cost plus an 8% mark-up).

13

21.     Additionally, the formula used by PERINO and Prime Contractor A to determine payment to ASI is consistent with PERINO's companies being pass-through DBEs. According to an ASI "Quarterly Summary Sheet" signed by a Prime Contractor A officer and PERINO, ASI billed Prime Contractor A by using its "Total Material" costs plus a "Mark-Up at 3%." Additionally, ASI billed Prime Contractor A for its "Total Labor" cost plus a "Mark-Up at 8%."

### Perino's Admissions to USDOT-OIG Agents

22.     On March 16, 2009, USDOT-OIG agents interviewed PERINO. PERINO admitted that the material prices on her Schedule C for the North Avenue bridge project were provided by Prime Contractor A. PERINO stated that Prime Contractor A provided the specifics from previously arranged agreements with the suppliers.

23.     Since that interview, PERINO's companies have continued to contract and work with Prime Contractor A. For example, Perdel Contracting is a DBE subcontractor working on Prime Contractor A's Wacker Drive project.

### Perino Agrees to Act as Pass-through with CW1's Prime Contractor And Invoice CW1 for Work Not Performed so that CW1 Could Meet his WBE Requirements

24.     CW1 owns Prime Contractor B, which performs work for the City of Chicago, among other government entities. For a number of years, CW1 engaged in fraud on the City of Chicago and other government entities utilizing a sham company to fulfill the government entities' WBE and DBE requirements. CW1 has been informed that he will be charged for committing this fraud and has been cooperating with federal law enforcement in an attempt

14

to receive a sentencing reduction. Prime Contractor B continues to contract with the City of Chicago. One of Prime Contractor B's projects was up for bid in June 2011 (the "June 2011 bid"). I directed CW1 to meet with PERINO to determine whether PERINO would agree to use Perdel Contracting as a pass-through WBE for CW1.

25. On June 20, 2011, CW1 spoke with PERINO and Individual A, who is an employee of PERINO's companies, about becoming a subcontracting WBE/DBE so that Prime Contractor B could meet its WBE/DBE requirements in its June 2011 bid. As shown below, PERINO and Individual A agreed to have Perdel Contracting act as a pass-through WBE/DBE by performing work normally done by Prime Contractor B by: (a) placing Prime Contractor B's employees on its payroll to do the work; (b) using Prime Contractor B's equipment to perform the work; (c) entering into a sham contract to "purchase" the equipment from Prime Contractor B; (d) titling the equipment in Perdel Contracting's name; and (e) having a side agreement to give the equipment back to Prime Contractor B when the contract ended for $1.

26. During the meeting with PERINO and Individual A on June 20, 2011, CW1 explained that he was going to bid on a City project that week and that he needed to meet the City's requirement of 5% WBE participation on the bid. CW1 explained that the last time the City awarded the contract, it was for approximately $9 million.

27. After discussing various ways she could participate in the contract, PERINO, Individual A, and CW1 focused on Perdel Contracting billing Prime Contractor B for street

sweeper services. Because Perdel Contracting did not have a street sweeper, Individual A stated that they could "buy it from you [Prime Contractor B] and sell it back to you [Prime Contractor B]." PERINO said "if we do that, we have to re-label it and everything." I understand this to mean that Perdel Contracting would purchase a street sweeper from Prime Contractor B, re-label the street sweeper with Perdel Contracting's name on it, and sell the street sweeper back to Prime Contractor B at the conclusion of the contract. After further discussion, Individual A stated that the sweeper was "the way to go" because it was the "cleanest thing." CW1 stated that he could "fill it up with fuel. No big deal." I understand this to mean that CW1 would pay for the fuel costs of the sweeper that was used on the project.

28.    On June 22, 2011, CW1 called Individual A at Perdel Contracting. CW1 asked what Individual A thought "about the street sweeper thing." Individual A said that "it should work." Individual A stated that what Perdel Contracting ought to do is buy a few of the street sweepers from CW1 "and sell them back." I understand this to mean that Individual A was suggesting that Perdel Contracting sell the street sweepers back to Prime Contractor B when the contract was over. Individual A stated that Perdel Contracting needed a few because he wanted to have a backup in case one broke down. CW1 stated that CW1 would "maintain it." CW1 said that they could create a "bill of sale" and that Perdel Contracting "can plate it." CW1 reiterated that CW1 would "maintain it . . . do any necessary work." I understand this to mean that Prime Contractor B would sell street sweepers to Perdel Contracting, that

16

Perdel Contracting would register these street sweepers, and that Prime Contractor B would pay for the maintenance costs of whatever street sweepers were used on the project.

29.    CW1 stated that he wanted Perdel Contracting to "take a couple of [Prime Contractor B's employees] and put them on your payroll." Individual A said, "you mean as far as like a driver and that?" Individual A responded, "OK." I understand this to mean that Prime Contractor B would provide Perdel Contracting with Prime Contractor B's employees to operate the street sweepers.

30.    CW1 asked Individual A what Perdel Contracting would charge CW1. Individual A responded that he talked about it briefly with PERINO, but that he needed to talk to her more. Individual A stated that he did not know what to quote CW1. Individual A said that they "[n]ormally . . . try to get on top of the whole package about 18% total on top of the benefits . . . . whatever the pure costs are." CW1 asked, "whatever your burden is (i.e., what her full costs would be)?" Individual A responded, "fully burdened labor." I understand this to mean that Perdel Contracting normally passes its full labor costs with a mark-up onto its prime contractor. Individual A informed CW1 that the "fully burdened" cost of the laborer would be $80.85. Individual A stated that with the 18% mark-up, the charge to CW1 would be $95.40 per hour.

31.    CW1 then asked about what Perdel Contracting would charge CW1 for the sweeper. CW1 stated that he would "do all of the maintenance . . . the fueling of it." Individual A responded that he did not know what the market will bear, but that he "would

17

like to get something on it." Individual A stated that industry rates were normally "$20 on top of fuel." CW1 stated that he would "assume the costs of sweeper" and asked if Individual A wanted "$20 over and above costs." Individual A said that "if that is fair, that's what we'd like to do." I understand this to mean that Perdel Contracting would make a profit of $20 an hour on the street sweepers, despite the fact that CW1 would be selling Perdel Contracting the street sweepers, CW1 would be maintaining the street sweepers, and CW1 would be providing the fuel for the street sweepers.

32.     CW1 said that for labor, CW1 would put "one guy on your payroll and if you need two, I'll add two." I understand this to mean that CW1 would provide Perdel Contracting with the employee to operate the street sweeper and if they needed to add a second employee to Perdel Contracting's payroll for CW1 to meet his WBE participation goals, they would do so.

33.     CW1 asked whether PERINO had signed a Schedule C letter of intent to perform as a WBE/DBE subcontractor for Prime Contractor B.[2] Individual A stated that PERINO had not signed the form, but that someone else from the office could sign it for her. Individual A stated that he needed to "get a hold of [PERINO] and tell her what we are doing."

---

[2] Among other things, the Schedule C form asks for the specification number of the project, the project description, the name of the MBE/WBE firm, the description of services or supply the MBE/WBE firm will provide, and the price that the MBE/WBE will charge the prime contractor.

18

34.     On June 23, 2011, CW1 called Perdel Contracting and spoke to Individual A. CW1 asked if Individual A had "talked to Elizabeth [PERINO]?" Individual A stated, "yeah, buy a sweeper and put a guy on and that's the way we do it . . . as long as you handle all the fuel and the stuff." CW1 added, "and the maintenance." Individual A responded, "yeah. We'll have to put that in a separate thing, but whatever." I understand this to mean that Individual A and PERINO agreed to purchase a street sweeper from CW1, add employees from CW1's company to Perdel Contracting's payroll, and have CW1 maintain and provide fuel for the street sweeper. I further understand that Individual A wanted to have a side agreement to have CW1 perform the maintenance so that the City would not know that this was occurring. Individual A stated that PERINO was still out of town, but that Individual A would send the Schedule C.

35.     That afternoon, CW1 received an email from Individual A that attached a Schedule C. The letter of intent stated that Perdel Contracting was a WBE and would "[p]rovide labor and equipment for pavement sweeping as required." The letter stated that Perdel Contracting would charge CW1's Prime Contractor B rate of $115.40 per hour.

36.     Later on June 23, 2011, CW1 called PERINO. CW1 stated that he wanted to go over the bid with PERINO as he had with Individual A. CW1 informed PERINO that Individual A sent CW1 the Schedule C. PERINO said that the "the only to piece to work out is the equipment." CW1 stated that if he received the contract from the City that they could "work it out after the fact." PERINO said that they would "have to work it out after," but

19

that the "equipment will have to belong to" Perdel Contracting. I understand this to mean that CW1 and PERINO would figure out the terms of the sale of the street sweeper from CW1's company to Perdel Contracting once CW1 obtained the City contract.

37.     CW1 stated that "somehow you could title the equipment in your name." PERINO said, "yes." CW1 stated that they would create "a bill of sale or something to that effect." CW1 stated that he will fuel it and maintain it. CW1 said that PERINO would "put a plate on it and put insurance on it and stuff like that." PERINO said that they "should be in decent shape." PERINO asked CW1 to let her know "as soon as you hear tomorrow" about the bid. CW1 said that he would do so. CW1 stated that he put PERINO "in for $225. $225,000 for your end." I understand this to mean that CW1 listed Perdel Contracting in CW1's bid as a WBE subcontractor for $225,000. PERINO said "thanks, [CW1]. Good luck."

38.     On June 27, 2011, CW1 called PERINO and informed her that CW1 was the only bidder on the City contract. CW1 said he was calling to go over the details of the street sweeper. CW1 said that he and Individual A discussed Perdel Contracting billing CW1 a $20 an hour for the sweeper. CW1 said that he wanted to see if they could do "something a little better on [the price]" since CW1 was "going to do all maintenance." PERINO said OK.

### PERINO Agrees to Provide CW1 with Fraudulent WBE Invoices so that CW1 Could Support Previously Unmet DBE Goals in a Compliance Audit

39.     In the same June 27, 2011 conversation, CW1 referenced a past City contract CW1 had with the City (the "Historical Contract"). CW1 mentioned that the City was

conducting a "compliance audit" on the Historical Contract. CW1 stated that he had "to input into their system anything that I've done you know in regard to MBE and WBE." CW1 told PERINO that he had not met his participation goals on the Historical Contract. Specifically, CW1 stated that he was "short on compliance on the past contract." CW1 said the contract was "ongoing" and that he "wanted to know if you guys wanted to maybe do the same thing on that contract." PERINO asked when CW1 would "be able to meet to talk about it?" They agreed to meet on June 29, 2011.

40. On June 29, 2011, CW1 met with PERINO and Individual A at Perdel Contracting's office. CW1 stated that he was losing one of his WBEs and needed to fill about $140,000 in past WBE participation. PERINO asked what CW1 meant. CW1 stated that he needed WBE participation from January 2010 reflecting approximately $140,000.

41. PERINO asked how often the City calculates WBE usage. CW1 stated that there was an online reporting process and that he needed to submit a certification reflecting WBE participation with his/her monthly invoice to the City. After PERINO and Individual A discussed the matter, Individual A stated that CW1 needed "to make up a year." PERINO then asked, "how are we going to get that paper trail, though?" PERINO stated that when the City performs its "audits, you gotta produce the cancelled check, you gotta produce your waivers, you gotta produce everything." Individual A asked when CW1's contract year ends. CW1 stated that the contract year expired at the end of the month and that CW1 needed participation for the last year. Individual A asked "how the fuck are we going to do that?"

21

42.     PERINO stated that the problem was with the new electronic system. PERINO said that they could not do it the way they used to "do it before." CW1 asked how they did it before. Individual A responded that "we could just make up a bunch of documents and do it . . . date 'em." Later in the conversation, PERINO said that "the problem that I've got, [CW1], is we can't do it like we've done in the past with some of the documents." Individual A said that they could "help [CW1] out with this month, but that is all we could do." I understand this to mean that PERINO and Individual A previously used to create fake paperwork to show false WBE participation, but that they were concerned that it would not work under the City's new system.

43.     PERINO asked how much can they could get done in the next couple of days. CW1 stated "nothing in the next couple of days, but for the month of June . . . ." Individual A asked how much work CW1 did in June. CW1 stated that he did $400,000 worth of work in June. Individual A asked about CW1's payroll for last week. CW1 stated "seven guys, 40 hours each." I understand Individual A to have been inquiring whether they could have Perdel Contracting pay CW1's employees for the past week and have Perdel Contracting bill CW1's company for the work.

44.     CW1 stated that all he needed was "a bill for anything . . . a bill for equipment."   Individual A asked how auditors tracked material used for the job. CW1 responded that he did not have to send anything regarding material sent to the job site. Individual A stated that not having to track material was "a license to steal." PERINO

22

expressed concern about not having payroll records if there was "another audit." Individual A suggested, "how about equipment rental?" PERINO stated that they still need paperwork to back up the equipment in case there was an audit.

45.     CW1 suggested that he give Perdel Contracting "a sweeper and a check and that you give it back to me." Individual A stated, "yeah, we'll have to do that. Buy a sweeper. On paper anyways." I understand this to mean that they would create paperwork showing that they had previously purchased a sweeper from CW1. CW1 stated that he would bring equipment to Perdel Contracting so that they could put Perdel Contracting's name on it.

46.     PERINO stated that she was concerned about an audit. PERINO mentioned a previous DBE audit that was conducted by "IDOT . . . for the bridge [North Avenue bridge]." PERINO said that "when they came . . . it wasn't a matter you giving 'em copies. They took computer copies." PERINO stated that the auditors "copied hard drives so they had access to all the transactions." Individual A said that they were being watched "like a fucking hawk." CW1 asked who was watching them. Individual A responded, "Everybody."

47.     Individual A said that he did not "know how to go back [bill for previous months] when we have not done the work." PERINO stated that she could "go back and do it. In the past, you just make up your documents and give it to them and everybody was happy, but . . ." Individual A responded, "yeah, you've got to prove it now." PERINO said she would have been "fat, dumb, and happy" if she had not gone through that audit.

23

48.     PERINO asked how they would get the money back to CW1. PERINO stated that CW1 was not "going to give me $140,000 because I'm cute." I understand this to mean that PERINO did not expect CW1 to pay her $140,000 for work that was not performed without having Perdel Contracting return money to CW1.

49.     Individual A stated that CW1 could rent a piece of equipment for "three months and pay us once every three months. You've had [the equipment] for 12 weeks. Now he's paying us." PERINO agreed, stating, "In essence, we do June invoice that invoices him for April, May, June." I understand this to mean that PERINO and Individual A would invoice CW1 for equipment rental for the last three months even though they had not leased equipment to CW1 during this period.

50.     PERINO stated that they cannot just use any rate. Individual A said they could use "whatever rate they agree on." CW1 stated that they would want it to "look good." Individual A agreed. They agreed to use rates published in the industry.

51.     Individual A began calculating what the bill would be for renting equipment 20 days a month for three months. CW1 said that the bills could go back more than a year and that they could backdate the bills. After discussing the accounting software that Perdel Contracting uses, they agreed that Perdel Contracting could not invoice from before January 2011.

52.     PERINO asked how they would set up the transaction. PERINO stated that Perdel Contracting would need to title the equipment and cover the insurance. PERINO said

24

that they would have to "cover that transaction." CW1 stated that it if "you owned the piece of equipment and I rented it from you, it would look fine." PERINO said, "correct." CW1 stated that they would have to "have a trail and a story for it."

53. PERINO asked CW1 how much she would have to pay CW1 to buy a sweeper. CW1 responded that the sweeper could go for anywhere between $10,000 and $50,000.

54. PERINO then asked CW1 what he was looking for Perdel Contracting to do on the contract going forward. CW1 stated that he would write them in. PERINO asked what the listed item of service would be. CW1 responded that there would be "Anything you guys can figure out" and that she could put CW1's employees on Perdel Contracting's payroll. After considering the idea of putting CW1's employees on her payroll, PERINO said, "OK." CW1 asked how this would work. PERINO said that "they have to become our guys" and that she would need "to put our regular guys on there, too . . . so when they look at the history, when they do comparisons . . . so it is not just all your guys on there." I understand this to mean that PERINO would include CW1's employees and PERINO's employees on the bill so that it would not raise suspicions during an audit.

55. PERINO stated that CW1 would have to issue her a purchase order so that they could bill CW1 for past work. PERINO said that she was not sure how much she could do and that she could not get him all the way there. I understand this to mean that PERINO would not be able to bill CW1 for the entire $140,000 that he needed for DBE participation. CW1 said "even close is good."

56.     Individual A stated that they needed to figure out a way to get the money back to CW1. PERINO said "for the next job, for the sweeper, it is going to be your equipment that we are going to title in our name." PERINO stated "that's how we can get [CW1 his] money back. We use this money to buy that equipment." Individual A stated that they would "buy two sweepers." Individual A stated that this would "make it an easier pass." PERINO said "we use that money that we are getting for this equipment to buy those and get them re-titled." CW1 stated "at that point it doesn't look like it's a pass through or anything. It looks like it's a legitimate [transaction]." Individual A agreed. PERINO replied, "yeah, you paid me for that equipment and then I bought that equipment from you. We'll have to get it re-titled and labeled." Individual A said that it was "almost a no-brainer at this point." PERINO said, "OK, that takes care of that piece." I understand this to mean that PERINO and Individual A would return some of the money that CW1 would pay them for work Perdel Contracting did not actually perform, and would create a paper-trail falsely showing that the repayment was for the purchase of two of CW1's street sweepers.

57.     Individual A and PERINO asked CW1 what they could do on the contract "going forward." Individual A said, "you [CW1] want us to do nothing." PERINO stated, "we can do the sweeper again." CW1 informed them that on this contract, his workers use "hand brooms," but that they could "send me a bill" for street sweepers. PERINO said that "for labor for this . . . we would sign up" CW1's employees and that they would use some of Perdel Contracting's employees as well. PERINO said that she would "sign them up" and

26

agreed to pay their union dues. PERINO said they would "just have to get money from [CW1]." Individual A said this would have to happen weekly. PERINO agreed, saying CW1 should pay whenever payroll is. CW1 agreed to pay them two days before their payroll was due.

58.     Individual A said that they would invoice as much as possible. PERINO asked what her percentage was. Individual A mentioned the profit margin they discussed for the street sweeper contract. Individual A asked if CW1 was "choking on that or what?" CW1 said "That one's a lot . . . because of this one now . . . you are going to make a few extra bucks, maybe we can ease up on the twenty bucks an hour on the machine." Individual A responded, "yeah, we're not going to have much in the way of costs. We're going to have a document trail and that's it."

59.     Later, PERINO stated that they would "go ten percent on" the past invoices. I understand this to mean that they would keep ten percent of the money CW1 paid to Perdel Contracting for work it did not perform. CW1 agreed to the ten percent figure and said that they needed to give him an invoice. Individual A stated that they would "tell him the biggest number we can do" and that they would "build it in" the invoice. PERINO stated that they would build a "ten percent mark-up." PERINO said "we'll use that money. We got to buy two sweepers." I understand this to mean that they would return 90% of the money that CW1 provided to them through a "purchase" of two street sweepers.

60.     PERINO stated that they "may have to buy two sweepers from you . . . depending on what we can get the invoice to be because that is the only way we can cleanly get you the money back . . . . So depending on what that number is, we'll probably have to end up buying two sweepers from you." I understand this to mean that although the job would only necessitate using one street sweeper, PERINO would purchase two sweepers from CW1 to try to make a return of 90% of the money to CW1 falsely look legitimate.

61.     PERINO explained to Individual A, who had received a phone call and missed part of the discussion, that they may have to buy two sweepers. Individual A agreed and told CW1 that CW1 could charge "whatever you want" for the sweepers. When CW1 said that he would charge "fair market value," Individual A laughed.

62.     Later, CW1 asked PERINO to recap what the plan was. PERINO said that she would find prices for items so she would know what to charge CW1 for the rental equipment, and that PERINO would invoice CW1. PERINO stated that they would bill for the last six months. PERINO stated that each piece of rented equipment would be billed to CW1 for 120 days and that CW1 would be billed a "stand-by" rate for 60 days. The "stand-by" rate would be for half the rate based on the time the equipment was purportedly sitting around on the job site unused.

63.     PERINO told Individual A that they would bill CW1 approximately $100,000 for the rental of equipment, take ten percent off of the rental rate, and the rest would go back

28

to CW1 for the purchase of the two sweepers at $45,000 each. PERINO stated that the sweepers would need to be "re-titled" so there is a "clean document trail."

64. CW1 asked if he would have a lien on the sweepers because CW1 would be still be out $90,000 since they would be holding onto the equipment. PERINO stated that she needed to title the sweepers to Perdel Contracting so they can do the insurance on it. PERINO asked CW1, "We weren't actually going to buy that equipment from you, though, for this other job, were we?" PERINO said that this arrangement made "it cleaner because all we are doing is giving you your money back because we weren't going to pay for the equipment anyhow." PERINO asked whether this was "correct?" CW1 agreed that this was correct. CW1 stated that they would "officially . . . own the machines, though" and again mentioned having a lien on them.

65. PERINO stated that CW1 could not be a lien holder on the equipment because then it would be "traceable." PERINO said a lien would make it "look[ ] like we're doing exactly what we're doing." PERINO added that there would be a side deal to sell the equipment back to CW1 for a dollar per machine. PERINO said that a separate deal with the sweepers was the only way to get the money back to CW1.

66. Individual A, who had left the room, reentered. PERINO explained to Individual A that they would bill CW1 for equipment rental at a published price for January through June, that 60 of those days would be billed at standby price, and that the rest would be billed at full price. PERINO estimated that this would come out to about $100,000.

29

PERINO said they would "Take ten percent off of that, which we're keeping." PERINO stated that they would get a bill of sale from CW1 for two sweepers at $45,000 each. PERINO again mentioned that CW1 could not put a lien on the sweepers because the transaction would then be "traceable" and "it looks like exactly what we did." PERINO said that at the end of the contract they would have a "gentleman's agreement" to sell the equipment back to CW1 for two dollars. PERINO, Individual A, and CW1 discussed how this "gentleman's agreement" would be a private agreement between CW1 and PERINO. Individual A stated that there could be a hand-written document.

67. PERINO said that the side agreement had to be handwritten because she did not want it on the computer. PERINO stated that during the prior audit, she deleted files off of her hard drives, but her forensic experts told her to "never delete it." PERINO and Individual A then discussed ways to truly wipe a disk or hard drive clean.

68. Individual A then went back to their "purchase" of the sweepers from CW1. Individual A said the purchase "makes it easier to do the other job because we are doing this now." PERINO added, "otherwise we had to try to figure [it] out . . . . we're going to say we were paying for that other equipment" and "doing this deal makes the other deal cleaner."

69. PERINO, Individual A, and CW1 agreed that PERINO needed to have their computers reflect an invoice date of June 30, 2011. PERINO stated that they needed to wait to issue an invoice until they received a purchase order from CW1.

30

70.     CW1 clarified that the ten percent that would be deducted from the amount CW1 paid would be Perdel Contracting's "fee." PERINO responded that they would deduct the money because "that is cleaner" and that "[t]he sooner we do it the cleaner it is." PERINO said that they needed to have the sweepers re-titled before they started the second job. Individual A noted that they would have plenty of time, given how long it would take for the contract to be awarded.

71.     On June 30, 2011, CW1 returned a phone call from Individual A. Individual A informed CW1 that PERINO needed a purchase order before she generated an invoice. Individual A stated that the purchase order should be for $140,000 from July 1, 2010 to June 30, 2011. Individual A stated that they were "at 95,648. That's how much we could come up with." I understand this to mean that Individual A and PERINO would charge CW1 $95,648 for work they purportedly performed for CW1 from June 30, 2010 to July 1, 2011. Individual A instructed CW1 to make the purchase order for more than this amount and that the invoice would reflect that they had "only fulfilled this much of the purchase order."

72.     Later on June 30, 2011, CW1 called Individual A and said that he would fax a purchase order to Perdel Contracting. Individual A stated that the purchase order was for $140,000 from July 1, 2010 through June 30, 2011. CW1 said that if PERINO was available, CW1 would pick up their invoice on July 1, 2011. Later that day, CW1 sent an email to PERINO stating, "As discussed for your use." The email attached a blank purchase order on Prime Contractor B's letterhead.

31

73.     Only July 1, 2011, CW1 called Perdel Contracting and asked to speak with PERINO. Individual B, a Perdel Contracting employee, informed CW1 that Individual B would be "doing the purchase order." Individual B then transferred CW1 to PERINO. When PERINO picked up the line, she informed CW1 that she "did up" the purchase order by listing each of the pieces with the amount billed. PERINO stated "we've got an invoice for $95,648."

74.     Later on July 1, 2011, CW1 called Perdel Contracting and spoke with Individual C, another Perdel Contracting employee. Individual C stated that she had the purchase order and asked where CW1 wanted it faxed. CW1 asked Individual C to send everything via FedEx. Individual C stated that she would let PERINO know. CW1 informed Individual C that CW1 provided Perdel Contracting with a FedEx shipment form so that Perdel Contracting could send CW1 the filled out purchase order and invoice while CW1 was in Florida on a pre-planned vacation.

75.     On July 5, 2011, Individual D, a Prime Contractor B employee, received an email from Individual C. The email stated that CW1 had sent Perdel Contracting "information to be signed and returned for the O'Hare Emergency Asphalt job." The email stated, however, that Perdel Contracting did not "have the information for the [S]chedule C." The email asked Individual D to either provide the information or fill out the attached Schedule C and return it back to Individual C.

32

76.     On July 6, 2011, CW1 called PERINO, who stated that she was trying to get the paperwork filled out. PERINO asked CW1 for the specification number and the project description so she could fill out the Schedule C. CW1 provided PERINO with the specification number and the project description.

77.     PERINO asked CW1 what date they were using for the purchase order and invoice. CW1 replied that she could "go back as far as you want." After mentioning that they could use January 2011 to the present, CW1 clarified that the end date should be June 30, 2011. PERINO informed CW1 that she would try to "get this finished up and FedExed over to [CW1's] office." CW1 instructed PERINO to ship the invoice and purchase order to CW1 in Florida. PERINO stated she would do so.

78.     According to CW1, on or about July 7, 2011, CW1, while in Florida, received a FedEx shipment from Perdel Contracting. The airbill indicates that is was shipped by "Elizabeth Perino" from "Perdel Contracting Corp." on July 6, 2011. CW1 provided this package to me on July 20, 2011. The package was unopened when I received it. Included in the package were:

a.     A [REDACTED] purchase order to Perdel Contracting that listed a date of December 1, 2010, purported to order six pieces of equipment, and provided regular rates and stand-by rates for the use of that equipment. The purchase order number was the same number as the blank purchase order CW1 provided to PERINO via email on or about June 30, 2011.

33

b.    A handwritten post-it note attached to the purchase order stating, "Tony we need a signed copy back. Thanks."

c.    A Perdel Contracting bill for $95,648 to CW1's company for the period ending June 30, 2011, with a signed certification in the name of a Perdel Contracting employee stating that "[t]he undersigned contractor certifies that, to the best of the contractor's knowledge, the work on the above named job has been completed in accordance with the plans and specifications to the level of completion indicated on the attached schedule of completion."

d.    An itemized "Schedule of Work Completed" that details purported equipment rental by CW1's company for $95,648.

e.    A City Office of Compliance letter from August 24, 2010 addressed to PERINO stating that Perdel Contracting was a certified WBE.

f.    A Schedule C, dated December 1, 2010 and signed in PERINO's name, for Perdel Contracting as a WBE to perform as a subcontractor for Prime Contractor B by "Provid[ing] equipment per attached proposal."

g. An estimate, dated November 16, 2010 and signed in PERINO's name, for the lease of equipment listed in the purchase order.


FURTHER AFFIANT SAYETH NOT.


STEPHEN J. O'REILLY
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on July 21, 2011.


JEFFREY COLE
United States Magistrate Judge

35